

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ALBERT RANDOLPH,

Plaintiff,

v.                                                                                    Civil Action No. 3:08CV708

LORETTA KELLY, et al.,

Defendants.

## MEMORANDUM OPINION

Albert Randolph, a former Virginia prisoner proceeding *pro se* and *in forma pauperis*, filed this action pursuant to 42 U.S.C. § 1983. Randolph claims his constitutional rights were violated by officials at Sussex I State Prison ("Sussex I") when he was subjected to Environmental Tobacco Smoke ("ETS"). Randolph asserts a violation of the Eighth Amendment[1] in that the Defendants[2] subjected him to cruel and unusual punishment. Defendants have filed a motion for summary judgment (Docket No. 37), to which Randolph has replied (Docket Nos. 53, 54). This matter is ripe for judgment.

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[2] Randolph sued Loretta Kelly, Warden of Sussex I; Keith Dawkins, Unit Manager of Randolph's housing unit; R. Wallace, Treatment Program Supervisor; D. Jones/Shiflett (hereinafter "Shiflett"), former Treatment Program Supervisor; D. Hudson, Grievance Coordinator; D. Bernardo, Grievance Official; Ms. Witt, Offender Records Officer; Mrs. Bailey, Medical Administrator; Mrs. Webb, LPN Nurse; G.F. Sivels, Regional Ombudsman; David Robinson, Regional Director; and Mrs. Evans, Offender Records Designee. By Memorandum Opinion and Order entered on November 4, 2010, the Court dismissed the action against Defendants Bailey and Webb because Randolph had failed to serve them in a timely manner. All of the remaining defendants are sued in their official and individual capacities. As used in this Memorandum Opinion, "Defendants" refers to all of the remaining defendants in this action.

## I. PROCEDURAL HISTORY

Randolph was housed at Sussex I beginning on February 1, 2008. On October 24, 2008,[3] Randolph filed this civil suit against twelve employees at Sussex I for subjecting him to second-hand smoke. Randolph requests the Court to move Randolph to a designated non-smoking pod, to enjoin Sussex I from housing Randolph in a smoking pod, and to require Sussex I to designate a non-smoking pod in one of the two non-privilege pods. (Compl. 9.) Randolph also requests $350,000 from each defendant. (Compl. 9.)

Nine of the defendants, represented by the Virginia Attorney General's office, submitted an answer and motion for summary judgment (Docket Nos. 14, 15), to which Randolph responded (Docket No. 18). Subsequently, the Attorney General's office commenced representation of Defendant Evans (Docket No. 20) and submitted an answer and motion for summary judgment on her behalf (Docket Nos. 21, 22), to which Randolph responded (Docket No. 27). Thereafter, Randolph filed a motion for summary judgment. (Docket No. 31.)

By Memorandum Opinion and Order dated March 9, 2010, the Court denied Defendants' motions for summary judgment. (Docket Nos. 35, 36.) On March 30, 2010, Randolph was transferred from Sussex I to the United States Penitentiary, McCreary, Kentucky. (Docket No. 41; Defs.' Br. Supp. Mot. Summ. J. (Docket No. 39) Ex. 2 ("Wallace Aff.") ¶ 18.) Randolph is no longer housed at Sussex I. Thus, his request to be moved is moot. Furthermore, Sussex I is

---

[3] *Houston v. Lack*, 487 U.S. 266 (1988).

now completely smoke-free. (Wallace Aff. ¶ 4.) Thus, Randolph's request for an injunction or designation of non-smoking areas is moot.[4]

Defendants submitted a second motion for summary judgment and a reply to Randolph's motion for summary judgment. (Docket Nos. 37, 38.) By Memorandum Opinion and Order dated September 8, 2010, the Court denied Randolph's motion for summary judgment. (Docket Nos. 46, 47.) Randolph filed an interlocutory appeal to the United States Court of Appeals for the Fourth Circuit challenging this Order (Docket No. 51), which the Fourth Circuit denied on December 29, 2010 (Docket No. 65). On October 13, 2010, the Court received Randolph's response to Defendants' motion for summary judgment.[5]

By Memorandum Opinion and Order entered on November 4, 2010, the Court dismissed the action against Defendants Bailey and Webb because Randolph had failed to serve them in a timely manner. (Docket Nos. 56, 57.) Randolph filed an interlocutory appeal challenging this Order to the Fourth Circuit.

Currently pending before the Court is Defendants' motion for summary judgment. (Docket No. 37.)

---

[4] "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (*citing Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986)).

[5] By Order dated March 9, 2010, the Court ordered that all dispositive motions must be submitted within thirty days of that date. Therefore, although Randolph's October 13, 2010 pleading was titled "Motion for Summary Judgement & Response To Defendants Motion for Summary Judgment," the Court construes this as a response only, and not as a second motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* Fed. R. Civ. P. 56(c) and 56(e) (1986)). When reviewing a summary judgment motion, a court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Defendants have provided eleven affidavits and other documents in support of their motion for summary judgment. Randolph submitted a responsive brief, as well as a host of attachments.[6] Additionally, Randolph's complaint is sworn under penalty of perjury. In light of

---

[6] The exhibits are generally identical to those attached to Randolph's original Brief in Support of Plaintiff's Motion for Summary Judgment (Docket 32). However, Randolph did not resubmit the May 1, 2008 Inmate Request Form in which the medical department informed Randolph that the medical test for ETS is not performed unless there is a medical need. (Docket No. 32, Encl. C.) He also did not resubmit a Patient Information Sheet entitled "Asthma." In

4

the foregoing principles and submissions, the following facts are established for purposes of the motion for summary judgment.

## III. SUMMARY OF PERTINENT FACTS

### A. Randolph's Arrival at Sussex I

Randolph, who suffers from asthma, was transferred to Sussex I on February 1, 2008. (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-I ("Randolph Aff.") ¶¶ 3, 7.) Upon arrival at Sussex I, Randolph attended an orientation session. (Randolph Aff. ¶ 3.) During this orientation, Randolph completed a smoking form. (Randolph Aff. ¶ 3.) On this form, Randolph stated that he did not smoke. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-AA.) However, he also indicated that he did *not* want a non-smoking cell partner.[7] (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-AA.)

Among the factors considered when making cell assignments is the inmate's documented smoking preference. (Defs.' Br. Supp. Mot. Summ. J. Ex. 3 ("Evans Aff.") ¶ 6.) The Records Department assigned Randolph to Housing Unit 4C, which is a smoking pod. (Randolph Aff. ¶ 4.) Randolph was assigned a cell with Jamel D. Rush, a documented smoker. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-A ("Rush Aff.") ¶ 3.) Rush smoked between a pack and a half to two packs of Black and Mild cigars each day. (Rush Aff. ¶ 3.) Randolph constantly complained about the

---

addition to most of the exhibits attached to Randolph's original motion for summary judgment, Randolph also attaches to his response additional inmate requests forms, affidavits from Randolph's former cellmates Rush and Jasper, and various other documents. The Court will consider only those documents attached to Randolph's current responsive pleading.

[7] The other options were "I SMOKE" and "I DO NOT SMOKE AND WOULD LIKE TO BE PLACED WITH A NON-SMOKING CELL PARTNER WHEN POSSIBLE." (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-AA.) Randolph did not select this latter option. This form states that "[s]moking preferences (which affect cell assignments) may only be changed once per year by sending a request form to the Records Department." (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-AA.)

5

smoke and asked Rush to stop smoking in the cell. (Rush Aff. ¶ 3.) Rush witnessed Randolph having difficulty breathing in the cell. (Rush Aff. ¶ 4.)

On February 22, 2008, Randolph was assigned housing in Unit 2A. (Wallace Aff. ¶18; Randolph Aff. ¶ 4.) At that time, Unit 2A was a general population pod. (Wallace Aff. ¶ 18.)

On February 28, 2008, Sussex I began the Graduated Rewards Incentive Program ("GRIP").[8] (Wallace Aff. ¶ 9.) On that date, Housing Unit 2A became the privilege, non-smoking pod, and Randolph was moved to Housing Unit 2B. (Wallace Aff. ¶¶ 8, 18.)

### B. March 2008

On March 7, 2008, officials moved Randolph to Housing Unit 4A, which was a smoking, non-privilege unit. (Randolph Aff. ¶ 5; Wallace Aff. ¶ 18.) Officials moved Randolph to Unit 4A "due to the facility's preparation to implement a new evidence based practices program." (Randolph Aff. ¶ 5 (capitalization corrected).) Randolph had a non-smoking cellmate. (Randolph Aff. ¶ 10.) Nevertheless, smoke entered Randolph's cell, which triggered his asthma. (Randolph Aff. ¶¶ 6–7.)

On March 15, 2008, Randolph submitted a Request Form to Nurse Webb, a medical administrator. (Pl.'s Br. Supp. Mot. Summ. J. Ex. I-A ("Mar. 15 Request Form").) On this form, Randolph informed Webb that Randolph had chronic asthma. (Mar. 15 Request Form.) Randolph stated that he was "being subjected to inhale high levels of second hand smoke, which [was] causing [him] to have breathing problems and headaches." (Mar. 15 Request Form (capitalization corrected).) On March 17, 2008, Webb responded, "Second hand smoke is not

---

[8] GRIP offers incremental increases in privileges and opportunities as offenders advance through the program. (Wallace Aff. ¶ 10.) An inmate's housing unit assignment is solely dictated by the inmate's behavior. (Wallace Aff. ¶ 12.)

good for anyone and it does pose a health issue for anyone with respiratory problems. You need to talk to your counselor about moving. Medical can't order cell changes." (Mar. 15 Request Form.)

On March 28, 2008, Randolph submitted a Request Form to Defendant Dawkins, Unit Manager. (Pl.'s Br. Supp. Mot. Summ. J. Ex. 1-B ("Mar. 28 Request Form").) On this form, Randolph informed Dawkins that Randolph was an asthmatic patient currently taking two inhalers. (Mar. 28 Request Form.) Randolph further informed Dawkins that his cell was between two cells housing smokers, which was triggering his asthma. (Mar. 28 Request Form.) Randolph requested to be moved back to Unit 2A, a non-smoking pod. (Mar. 28 Request Form.) On March 31, Dawkins responded, "It is important to note that while every offender who claims non-smoking status cannot be housed in the non-smoking pod, this facility does ensure they are assigned to a cell with a non-smoker. If you have further issues, please let me know." (Mar. 28 Request Form; Defs.' Br. Supp. Mot. Summ. J. Ex. 6 ("Dawkins Aff.") ¶ 8.)

### C. April 2008

On April 1, 2008, Randolph submitted a Request Form to Defendant Wallace, Senior Counselor. (Pl.'s Br. Supp. Mot. Summ. J. Ex. 1-C ("Apr. 1 Request Form").) On this form, Randolph repeated the fact that he was asthmatic, taking two inhalers, and housed next to smokers. (Apr. 1 Request Form.) On April 4, 2008, Wallace responded, "You are being housed over there temporarily & as long as you're celled with another non-smoker, you are ok. We do have a non-smoking pod that you can request to go to if you are released from the non-privileged pod." (Apr. 1 Request Form.)

On April 2, 2008, prison officials received a request from Randolph in which he stated that the smoke coming from the smokers housed in the cells on either side of his cell was causing him to wheeze and it was causing breathing complications. (Dawkins Aff. ¶ 10.) Dawkins advised Randolph that if Randolph had a medical situation he should address his concerns to the medical department. (Dawkins Aff. ¶ 11.) Dawkins also noted that Randolph was assigned to a non-privileged pod with a non-smoking cellmate. (Dawkins Aff. ¶ 11.)

On April 10, 2008, Randolph submitted an Informal Complaint form. (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-A ("Apr. 10 Informal Compl.").) On this form, Randolph complained of the fact that he is an asthmatic patient taking two inhalers and housed between two cells with smokers. (Apr. 10 Informal Compl.) The form was received on April 14, 2008 and returned because it was a request for services. (Apr. 10 Informal Compl.; Defs.' Br. Supp. Mot. Summ. J. Ex. 7 ("Witt Aff.") ¶ 16.) Defendant Witt wrote that Randolph should submit a request form to speak to his unit manager. (Apr. 10 Informal Compl.; Witt Aff. ¶ 16.)

On April 11, 2008, Randolph submitted another Informal Complaint form. (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-B ("Apr. 11 Informal Compl.").) On this form, Randolph complained that Defendant Wallace stated that as long as Randolph was housed in a cell with a non-smoker that he was okay. (Apr. 11 Informal Compl; Witt Aff. ¶ 13.) Randolph wrote that Wallace does not know the severity of Randolph's respiratory problems. (Apr. 11 Informal Compl.) Randolph complained that Wallace was not qualified to make a medical determination because she is not an RN, a PRN, or part of the medical department. (Apr. 11 Informal Compl.) The form was received on April 14, 2008 and was returned to Randolph by Defendant Witt. (Apr. 11 Informal Compl.) The reason it was returned was because Randolph raised more than

one issue. (Apr. 11 Informal Compl.; Witt Aff. ¶ 14.) Randolph had complained that Wallace was not part of the medical department and also complained about not being in a non-smoking pod. (Apr. 11 Informal Compl.) Randolph was instructed to resubmit the complaint with only one issue. (Apr. 11 Informal Compl.)

On April 11, 2008, Randolph submitted an Inmate Medical Request Form. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-G ("Apr. 11 Medical Request Form").) On this form, Randolph gave Nurse Webb permission to advise the Building 4 Unit Manager of Randolph's medical condition. (Apr. 11 Medical Request Form.) Randolph further stated that he gave Nurse Webb permission to inform the Building 4 Unit Manager that Randolph needed to be housed in a non-smoking pod instead of a smoking pod. (Apr. 11 Medical Request Form.) On April 17, 2008, Nurse Webb responded, "Request Received. Please fill out form. The person named on form have to request this info." (Apr. 11 Medical Request Form.)

On April 16, 2008, the medical department examined Randolph because he complained of wheezing. (Defs.' Br. Supp. Mot. Summ. J. Ex. 10 ("Soloria Aff.") ¶ 7.) During the examination, the medical staff noted that Randolph was not in acute distress at the time of his visit. (Soloria Aff. ¶ 7.) Randolph's lung sounds were clear and his respirations were normal. (Soloria Aff. ¶ 7.) When the exam was repeated, medical staff noted that there was some wheezing in Randolph's left lung, and that his right lung was clear. (Soloria Aff. ¶ 7.) The medical report did not note that the reason for the wheezing was due to being housed with smokers. (Soloria Aff. ¶ 7.)

On April 16, 2008, Randolph submitted another Inmate Medical Request Form. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-F ("Apr. 16 Medical Request Form").) On this form, Randolph

stated that he was seen by the nurse about his wheezing. (Apr. 16 Medical Request Form.) Randolph stated that the nurse determined that he was "alright" after she performed a check-up. (Apr. 16 Medical Request Form.) Randolph requested to see a doctor for further treatment. (Apr. 16 Medical Request Form.) On April 21, 2008, Nurse Webb responded, "Your housing unit assignment is per Security. Please talk to your counselor. Please use inhalers as prescribed." (Apr. 16 Medical Request Form.)

On April 17, 2008 Randolph submitted two Request Forms to Defendant Jones, Treatment Program Supervisor. (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-C, K-D ("Apr. 17 Request Forms").) On these forms, Randolph again complained about his asthma. (Apr. 17 Request Forms.) Randolph stated that he is being denied a transfer "because of infractions that [he] caught on 12-5-07, 12-12-07, and 1-23-07." (Apr. 17 Request Forms (capitalization corrected).) On April 25, 2008 Jones responded, "See attached." (Apr. 17 Request Forms.) Jones attached a response with the subject "HOUSING UNIT ASSIGNMENTS." (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-E ("Apr. 25 Response").) This response provided an explanation about the prison's incentive-based housing. (Apr. 25 Response.) The response stated in part:

> According to the information available, you received three or more charges which places in a Non-Privilege Unit. . . . It is important to remember that each offender has the opportunity to make their own choice concerning housing unit assignments. Those who want to enjoy the privileges and the programming available must only do their part. The Medical Department has the authority to evaluate your medical issues if they are serious and warrant special attention.

(Apr. 25 Response.)

On April 30, 2008, Randolph submitted an Informal Complaint generally complaining of his situation and requesting to be moved. (Dawkins Aff. Attach. C.) On May 6, 2008, Dawkins

responded, "When you are eligible to be release[d] to a transition pod, you will." (Dawkins Aff. Attach. C (capitalization corrected).)

**D. May 2008**

On May 1, 2008, Randolph submitted two Request Forms to Nurse Webb and an unnamed doctor. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-I ("May 1 Nurse Request Form"), J-J ("May 1 Doctor Request Form").) Randolph stated, "I'm in receipt of your response in regards to my medical record on my asthma and me listed as a non-smoker . . . Ms. Evans told me to have you all forward my file on these two to her. She also informed me that she has requested this information from medical." (May 1 Nurse Request Form (capitalization corrected).) Randolph also requested that the medical department order his transfer to a non-smoking pod and that the medical department inform the Records Department of this transfer. (May 1 Doctor Request Form.) On May 5, 2008, Nurse Webb responded to both request forms stating that she would consult the records. (May 1 Nurse Request Form; May 1 Doctor Request Form.)

On May 6, 2008, Randolph submitted a Request Form to Medical Administrator Bailey. (Pl.'s Br. Supp. Mot. Summ. J. Ex. M ("May 6 Request Form").) On this form, Randolph requested to be examined for exposure to Environmental Tobacco Smoke. (May 6 Request Form.) Randolph also explained that he was experiencing breathing difficulties, headaches, and eye irritation. (May 6 Request Form.) Randolph also stated that he has had to increase his use of his inhalers. (May 6 Request Form.) Nurse Webb responded on May 13, 2008, "Will schedule MD appointment." (May 6 Request Form.)

On May 16, 2008, the prison grievance department received a regular grievance from Randolph in which he stated that he requested to be moved to a non-smoking pod. (Woodson Aff. ¶ 11.)

**E. June 2008**

On June 11, 2008, Defendant Woodson responded to Randolph's May 16 regular grievance. (Woodson Aff. ¶ 12.) Woodson noted that Randolph was not eligible for release to a transition pod. (Woodson Aff. ¶ 12.) Woodson determined that Randolph's cell assignment with a non-smoker satisfied requirements regarding smoking preferences. (Woodson Aff. ¶ 12.) Randolph's appeal of this decision was not timely and thus Randolph's appeal was returned to Randolph on June 27, 2008. (Defs.' Br. Supp. Mot. Summ. J. Ex. 8 ("Robinson Aff.") ¶ 7.)

On June 12, 2008, Randolph Submitted a Request Form to Defendant Shiflett, Treatment Program Supervisor. (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-G ("June 12 Request Form").) The form states that Randolph was awaiting bed space in the transition pod. (June 12 Request Form.) He requested that TPS Shiflett move him to Unit 2A, or at least grant him the privileges such as access to the law library and school programs. (June 12 Request Form.) On June 18, 2008 Shiflett responded, "You are currently on the list awaiting a move to Transition Housing - 4D. This is a GRIP Pod that operates at a GRIP Level III, unless there are an excessive number of charges as outlined in the recent memo from the Warden's Office." (Pl.'s Br. Supp. Mot. Summ. J. Ex. K-H.)

## F. July 2008

On July 7, 2008, Randolph was moved from Unit 4A to Unit 4D. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-B ("Jasper Aff.") ¶ 2; Wallace Aff. ¶ 18.) His cellmate was Patrick Jasper, a documented smoker.[9] (Jasper Aff. ¶¶ 1–2.) Jasper smoked between two and three packs of cigarettes each day. (Jasper Aff. ¶ 4; Plaintiff's Br. Supp. Mot. Summ. J. Ex. J-D ("Randolph Cell Change Request Form").)

On July 8, 2008, Randolph submitted a cell change request form to Defendant Dawkins, Housing Unit Supervisor. (Randolph Cell Change Request Form.) This form stated that Randolph had been moved from Unit 4A to Unit 4D into a cell with a smoker. (Randolph Cell Change Request Form.) Jasper submitted a cell change request form, too. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-E ("Jasper Cell Change Request Form").) Dawkins told Jasper that he would look into making a cell change (Jasper Aff. ¶ 5), but ultimately disapproved of the move (Jasper Cell Change Request Form). Jasper attempted to alleviate Randolph's breathing problems by standing at the cell door and blowing smoke into the pod, but the smoke would blow back into the cell.[10] (Jasper Aff. ¶ 5.)

---

[9] Defendants dispute this fact. Defendant Evans swears, "The smoking/non-smoking information form located in Jasper's inmate record indicates that he was not a smoker and would like to be placed with a non-smoking cell partner when possible. However, a review of Jasper's commissary purchases revealed that he has purchased tobacco on two dates . . . since his arrival at Sussex I." (Evans Aff. ¶ 8.)

[10] Building and Grounds Supervisor for Sussex I, C.D. Faircloth, stated in his affidavit that air in the common areas of the prison is re-circulated, while air in cells is completely exhausted to the outside and replaced with fresh air. (Defs.' Br. Supp. Mot. Summ. J. Ex. 4 ("Faircloth Aff.") ¶¶ 4, 6.)

13

Randolph remained housed with Jasper until August 6, 2008, when Randolph was moved to segregation. (Evans Aff. ¶ 9.) Inmates are not allowed to smoke while in segregation. (Wallace Aff. ¶ 18.) Randolph's evidence does not complain of second-hand smoke again until April 2009.[11]

### G. April 2009

On April 7, 2009, Randolph was moved from a segregation unit to Unit 4A. (Wallace Aff. ¶ 18.) On April 11, 2009, the medical staff examined Randolph after Randolph complained of chest tightness. (Soloria Aff. ¶ 8.) Randolph stated that he had experienced the tightness for about two weeks and that he had been using inhalers. (Soloria Aff. ¶ 8.) The medical staff noted that his last attack prior to this one occurred in April of 2008. (Soloria Aff. ¶ 8.) Randolph had last used his inhaler a week prior to his examination. (Soloria Aff. ¶ 8.) Randolph's examination revealed that he was not in acute distress at the time of his visit. (Soloria Aff. ¶ 8.) Randolph's lung sounds were clear and his respirations were normal. (Soloria Aff. ¶ 8.)

On April 16, 2009, Harry Richard Hammar III moved into a cell with Randolph. (Pl.'s Br. Supp. Mot. Summ. J. Ex. J-C ("Hammar Aff.") ¶ 1.) Hammar was a documented smoker

---

[11] From August 6, 2008 until April 7, 2009, Randolph spent most of his time in non-smoking locations. (Wallace Aff. ¶ 18.) From August 6, 2008 until August 13, 2008 (seven days) Randolph was in segregation, where no smoking was permitted. (Wallace Aff. ¶ 18.) From August 13, 2008 until October 28, 2008 (two months, fifteen days) Randolph was housed in locations where smoking was permitted. (Wallace Aff. ¶ 18.) From October 28, 2008 until December 15, 2008 (one month, seventeen days), Randolph was housed in the non-smoking privilege pod. (Wallace Aff. ¶ 18.) On December 15, 2008 Randolph moved to isolation, where smoking was not permitted, and he remained there until March 19, 2009 (three months, four days), when he was placed back into a smoking unit. (Wallace Aff. ¶ 18.) From March 19, 2009 until March 24, 2009 (five days) Randolph stayed in the smoking unit. (Wallace Aff. ¶ 18.) On March 24, 2009, Randolph was moved to non-smoking segregation, where he remained until April 7, 2009 (fourteen days). (Wallace Aff. ¶ 18.)

14

who smoked two packs of cigarettes each day. (Hammar Aff. ¶ 2.) Both Hammar and Randolph requested to be moved, but their requests were denied. (Hammar Aff. ¶¶ 2–3.) Hammar observed Randolph having breathing difficulties and attempted to minimize the impact of the smoke by going to the door of the cell to smoke. (Hammar Aff. ¶ 3.) Hammar and Randolph were housed together until at least May 29, 2009. (Hammar Aff. ¶ 3.) On May 30, 2009, Randolph was moved to Unit 4B. (Wallace Aff. ¶ 18.) Randolph does not provide any information about his conditions of confinement after May 29, 2009.

## IV. ANALYSIS

An inmate's Eighth Amendment rights are violated when he is subjected to an unnecessary and wanton infliction of pain, *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991), "contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A two-part test is used to determine whether prison conditions present a constitutional violation. The plaintiff must show: "'(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (*quoting Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991)). The first showing requires the court to determine whether the deprivation of a basic human need was "*objectively* 'sufficiently serious,'" while the second requires it to determine whether the officials *subjectively* acted with a "'sufficiently culpable state of mind.'" *Id.* (emphasis in original) (*quoting Wilson*, 501 U.S. at 298).

To satisfy the objective element of an Eighth Amendment claim, the deprivation complained of must be extreme and amount to more than the "'routine discomfort [that] is part of

the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 1380 n.3

(*quoting Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Thus, Randolph "'must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions.'" *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997) (*quoting Strickler*, 989 F.2d at 1381).

"[A]n inmate can state a cause of action under the Eighth Amendment for present injuries as well as future damage resulting from exposure to ETS." *Johnson v. Pearson*, 316 F. Supp. 2d 307, 316 (E.D. Va. 2004) (*citing Helling*, 509 U.S. at 33). "Thus, the Eighth Amendment not only protects inmates suffering from current unconstitutional prison conditions, but also protects inmates against prison conditions which threaten to cause future health problems." *Id.* (*citing Helling*, 509 U.S. at 31–34). Because Randolph no longer resides at Sussex I—and because Sussex I is now completely smoke-free—Randolph could not make the claim that he could be harmed in the future. *Oliver v. Deen*, 77 F.3d 156, 159–60 (7th Cir. 1996) (finding that a prisoner could not make a future-harm claim because he was no longer housed at the prison in question). Moreover, Randolph has produced no evidence that he will sustain an injury to his future health. Thus, the Court will only analyze Randolph's present-injury claim.

As for the subjective component, "[d]eliberate indifference is a very high standard - a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (*citing Estelle*, 429 U.S. at 105–06). This standard requires a plaintiff to introduce evidence from which the finder of fact could conclude that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized

that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (*quoting Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

To survive summary judgment on his claim of excessive exposure to second-hand smoke, Randolph must demonstrate that "second-hand smoke caused him to suffer 'serious' existing health problems and that the Defendants were deliberately indifferent to his situation." *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999). Randolph's injuries—aggravated asthma, headaches, dizziness, nausea, shortness of breath, and watery eyes—"are, objectively speaking, relatively minor." *Id.* at 846 (*citing Oliver*, 77 F.3d at 160–61). "The issue here is simply whether [Randolph's] actual medical condition while at [Sussex I] was so serious as to implicate the Constitution and provide the basis for an award of damages." *Oliver*, 77 F.3d at 160.

Randolph did not submit any medical evidence of his asthma or how it may have been exacerbated over the course of his stay at Sussex I. To the contrary, Randolph submitted evidence indicating that a nurse determined that he was "alright" after she performed a check-up. (Apr. 16 Medical Request Form.)

Defendants submitted medical evidence showing that Randolph was medically examined twice for breathing-related problems: once in April 2008 and once in April 2009. At the time of both of these examinations, Randolph was housed in a cell or unit with smokers. Both examinations resulted in a finding that Randolph's lung sounds were either clear or indicated some wheezing. Both indicated that Randolph's respirations were normal. Neither examination found Randolph to be in acute distress. Neither report indicates that Randolph requested a cell change at the time of the examination.

17

Randolph's situation is not unlike the petitioner's in *Oliver v. Deen*:

> Mr. Oliver was asthmatic and showed signs of distress. A few fellow inmates said smoke made Mr. Oliver wheeze and that he showed other signs of discomfort. That's it. On the other hand, Mr. Oliver's medical records show that he received considerable medical attention for asthma concerns, as well as for other ailments.... He was given medication and an inhaler. He does not dispute that the medication and the inhaler were a proper medical response to his condition.

*Oliver*, 77 F.3d at 160. There, as here, the plaintiff could not satisfy the objective element required to support a claim of damages for cruel and unusual punishment. Randolph endured three brief periods of time in which he shared a cell with a smoker. On other occasions, Randolph inhaled second-hand smoke from the general air of the prison. According to the evidence submitted, this caused Randolph to wheeze or experience tightening of the chest occasionally. On the two occasions that he requested to be seen by medical staff, he was promptly seen, examined, and it was determined that his condition did not require treatment beyond inhalers. The record does not indicate "that a physician either diagnosed him as having a medical condition that necessitated a smoke-free environment or treated him for any condition or ailment brought about by his exposure to second-hand smoke—even though he made several trips to medical facilities during the course of his stay" at Sussex I. *Henderson*, 196 F.3d at 846. "Moreover, conspicuously absent from [the record] is any allegation that a physician ever recommended or ordered that he be removed from the allegedly smoky tier in which he was housed and placed in a non-smoking environment." *Id.*[12]

---

[12] The closest such recommendation occurred on March 17, 2008, when Nurse Webb told Randolph, "Second hand smoke is not good for anyone and it does pose a health issue for anyone with respiratory problems. You need to talk to your counselor about moving. Medical can't order cell changes." (Mar. 15 Request Form.)

18

Randolph is "unable to establish any reasonable basis for finding a significant medical condition or ailment at all resulting from his exposure to ETS." *Id.* Accordingly, Defendants' Motion for Summary Judgment (Docket No. 37) will be GRANTED. Randolph's submission entitled "Motion for Summary Judgment" (Docket No. 52) will be DENIED. The action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

Date: JAN 2 0 2011
Richmond, Virginia

/s/
Richard L. Williams
United States District Judge